## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOSHUA O. THOMAS,

     **Plaintiff,**

v.

FARMERS INSURANCE EXCHANGE,

     **Defendant.**

Case No. 18-2564-DDC-ADM

## MEMORANDUM AND ORDER

Plaintiff Joshua Thomas asserts discrimination and retaliation claims under Title VII against defendant Farmers Insurance Exchange. Plaintiff alleges that defendant discriminated against him because he failed to conform to male sex stereotypes and retaliated against him for filing a formal complaint and this lawsuit. Doc. 50 at 7–8 (Pretrial Order ¶ 4.a.). This matter comes before the court on defendant's Motion for Summary Judgment (Doc. 53). Plaintiff has filed a Memorandum in Opposition (Doc. 61), and defendant has filed a Reply (Doc. 69). For reasons explained below, the court grants summary judgment against plaintiff's claims.

### I.    Uncontroverted Facts

The following facts are either stipulated by the parties in the Pretrial Order (Doc. 50), uncontroverted, or, where genuinely controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

Defendant is a Nevada corporation registered to do business in Missouri. Defendant operates a Service Center in Olathe, Kansas. On March 9, 2015, defendant hired plaintiff as a Service Advocate II at its Olathe Service Center. On April 16, 2016, defendant promoted plaintiff to Senior Service Advocate. Plaintiff held this position until his termination on October

25, 2018. In these roles, plaintiff worked in defendant's Service Operations Personal Lines Division. Plaintiff's job duties included handling calls and questions from internal and external customers about insurance policies and accounts. From March 2015 to March 2018, plaintiff reported to Service Operations Supervisor Jeanann Sebers. From March 2018 to September 2018, plaintiff reported to Service Operations Supervisor Jarrod Shelton. From September 2018 until his termination on October 25, 2018, plaintiff reported to Service Operations Supervisor Curt Sims.

Plaintiff is a gay man. His affidavit testified that he "did not conform to stereotypes of how males behave and act in a way that was noticeable to [his] coworkers." Doc. 61-8 at 1 (Pl. Aff. ¶ 3). Plaintiff testified that, while at work, he wore "clothing that, though professional, was very stylish and fashionable in a way that [ ] did not conform to the way males stereotypically dressed." *Id.* (Pl. Aff. ¶ 4). Plaintiff's affidavit testified that he "was very attentive to [his] appearance and hygiene and kept [his] desk very tidy in a way that fails to conform to stereotypes of male behavior." *Id.* (Pl. Aff. ¶ 5). And, plaintiff testified in his affidavit, "during breaks I socialized primarily with my female co-workers while most male co-workers socialized with other male co-workers, in a way that fails to conform to stereotypes of how males behave." *Id.* at 1–2 (Pl. Aff. ¶ 6)).

### *Plaintiff's April 2018 Account Underwriter Specialist Application*

On April 2, 2018, plaintiff applied for a Personal Lines Account Underwriter Specialist position ("AU position") in Phoenix, Arizona. Defendant needed to fill two open AU positions in Phoenix. Defendant posted the positions only for its own employees. Ten employees, including plaintiff, applied. Eight candidates worked in Phoenix and one worked in Round Rock, Texas. Only plaintiff worked in Olathe. Personal Lines Field Underwriting Manager John

Radliff—located in Olathe—served as the hiring manager and selected candidates for the positions. Radliff testified that he had looked for three characteristics in applicants: decisiveness, customer service, and "leadership or teamwork." Doc. 54-3 at 6. The "Behavior Based Interview Guide" that defendant used while interviewing listed five "competencies" covered in the interviews: teamwork, decisiveness, persuasiveness, customer service skills/customer orientation, and "manage change." Doc. 61-12.

Radliff and Jared Schmitz (another manager) conducted interviews with all 10 applicants. Before plaintiff's interview, Shelton (plaintiff's supervisor at the time) talked to Radliff and recommended plaintiff for the job. Shelton told Radliff that plaintiff was "ready to move, single and had no kids."[1] Doc. 54-2 at 4; Doc. 54-1 at 33–34. Shelton then told plaintiff about the conversation. But, ultimately, Radliff selected Brittany Harris (female) and James Parchment Chavez (male) for the AU positions. Radliff selected Harris because she had "showcased" the skills he was looking for during her interview. Doc. 54-3 at 10–11. He selected Chavez because of his tenure with defendant and his experience training employees at the Phoenix location, and because he had interviewed well. *Id.* Chavez is gay, which Radliff didn't know at the time of the interview. Radliff also didn't know plaintiff is gay.[2]

On April 23, 2018, plaintiff sent Radliff an email requesting feedback on his interview. Later the same morning, Radliff sent plaintiff a message asking if he "had a moment to visit

---

[1]    During Radliff's interview with J.D. White—who investigated plaintiff's subsequent EEOC Charge—Radliff said that he did not remember any discussion with Shelton about plaintiff's marital or family status, or his ability to relocate. Doc. 61-28 at 17.

[2]    Plaintiff testified that he believed he had, at some point, told Shelton he is gay. Doc. 61-1 at 2. Plaintiff's former supervisor, Sebers, also may have known plaintiff is gay. But she never participated in the screening, interviewing, or hiring process for the AU positions. And, she made no decisions about plaintiff's employment after he began reporting to Shelton in March 2018.

about [j]ob feedback." Doc. 54-16 at 3. Plaintiff responded that he was on the phone and asked Radliff to email him. Radliff replied that he would "prefer to chat if possible" and specified that he meant he wanted to "chat" with plaintiff "in person," not online. *Id.* Radliff and plaintiff met, and Radliff told plaintiff that he had interviewed well, but had failed to show the necessary leadership skills for the position. Doc. 54-1 at 42. Radliff told plaintiff that maybe there would be a future position for him.[3] *Id.* at 40. And, he told plaintiff, "in the future I might not need a leader. I might have a bunch of alphas over there."[4] Doc. 54-1 at 42. Radliff testified that he wanted somebody who could "drive the team" and "be a good leader from a per[spective] of [Radliff] being a remote manager," since he managed the Phoenix employees from Olathe. Doc. 54-3 at 13–14. When asked whether the two candidates he selected were "alpha," Radliff testified that they had "showcased the leadership skills that [he] was looking for within the interview." Doc. 61-5 at 3–4. But, Radliff checked the box on the interview sheet reporting that plaintiff had "demonstrated" teamwork and leadership during his interview. Doc. 61-5 at 2. And, Radliff testified, the AU position wasn't a "leadership position." Doc. 61-5 at 12.

### Plaintiff's April 2018 Discrimination Complaint to Human Resources

On April 25, 2018, plaintiff emailed Amy Canton (defendant's Human Resources Consultant) complaining that Radliff had not selected him for an AU position. The next day, Canton met with plaintiff. She agreed to contact defendant's Talent Acquisition Department to learn more information about the decision and why plaintiff wasn't selected for role. On May 8,

---

[3]     Plaintiff never had interacted with Radliff before his interview. Radliff told plaintiff that developing some type of relationship or rapport with hiring managers before a job posts is a "valuable opportunity." Doc. 61-10 at 3:02. Despite Radliff's advice to plaintiff, he had developed no prior relationship with the two candidates he selected for the AU positions.

[4]     Unbeknownst to Radliff, plaintiff audio-recorded this conversation (Doc. 61-10).

2018, Kyle Velthouse (defendant's Human Resources recruiter) contacted Radliff about why he did not hire plaintiff, and Radliff asked to talk to Velthouse by phone about plaintiff. Doc. 61-5 at 8–9.

On May 10, 2018, Canton sent an email to plaintiff with information about why Radliff had not offered him the job, and provided five recommendations for improving his future interviews. Plaintiff replied by email to Canton, complaining that Radliff told him he was "not '[a]lpha enough'[ ] ([a]lpha meaning male characteristics, dominating)." Doc. 54-18 at 1. And, he complained, Radliff inappropriately had "pre-screened" him by asking his supervisor (Shelton) about plaintiff's marital status, age, and number of dependents. *Id.* Canton responded, suggesting that they—meaning plaintiff and Canton—meet with Shelton in person. Initially, plaintiff agreed to the meeting. But after receiving a final written warning (*see* Doc. 54-21),[5] plaintiff sent another email to Canton refusing to meet with Shelton "if I'm going to be harassed or picked apart, interrogated." Doc. 54-22 at 1. Plaintiff and Shelton never met.

### *Plaintiff's Performance in 2018*

In January 2018, Sebers met with plaintiff and "coached" him about a phone call based on "frustration heard" during the call.[6] Doc. 54-1 at 14; Doc. 54-11 at 9. In March 2018, Shelton—plaintiff's manager from March to September 2018—worked with plaintiff on his

---

[5]     Defendant issued plaintiff a final written warning on May 17, 2018. The court describes the circumstances of this final warning below. *See* pp. 7–9.

[6]     The record is unclear about whether plaintiff, the agent, or both felt the frustration. In any event, plaintiff received several positive reviews from Sebers, his supervisor from March 2015 to March 2018. For example, in plaintiff's 2017 mid-year review, Sebers wrote that plaintiff was willing to accept feedback about his performance, and that she was "confident [plaintiff was] taking the necessary feedback . . . to be an even stronger team member." Doc. 61-2 at 31. And Sebers never formally disciplined plaintiff while he reported to her. Canton testified that she considered plaintiff a "good employee" based on his performance ratings when he reported to Sebers, and that he had outstanding performance reviews in 2016 and 2017. Doc. 61-4 at 8, 23. And Canton described him as a strong performer to J.D. White, who investigated plaintiff's EEOC Charge. Doc. 61-28 at 2.

"CE" (customer experience) and his "tend[ency] to let his aggression show when frustrated."[7]

Doc. 54-12 at 1. Plaintiff testified that Shelton had worked with him in March 2018 on his

"verbal skills with agents." Doc. 54-1 at 24. On March 31, 2018, Shelton emailed his

supervisor, Karilynn Reeves, that he was "still working closely with [plaintiff] on his verbal

skills toward agents." Doc. 54-13 at 1. On April 3, 2018, Shelton wrote in plaintiff's

"Interaction Log"[8] that he met with plaintiff about "how his frustration shows through the

---

[7]     Plaintiff also received some positive reviews in 2018. On March 26, 2018, Shelton complimented plaintiff on his "[r]ock-solid performance" on his call metrics. Doc. 61-2 at 3. On March 27, 2018, plaintiff asked Shelton about areas where plaintiff had failed to receive a perfect score on agent surveys, and Shelton responded, "[e]xcellent question. This is the type of attitude that I appreciate and will make you more successful in your role." *Id.* at 4. Shelton testified he said this because plaintiff had "tak[en] ownership of his performance." *Id.* Later the same day, Shelton sent plaintiff a message saying, "I'm listening to your call. I love how you're telling him and showing him how to do it. Nice work." *Id.* at 6. On March 31, 2018, Shelton told plaintiff, "I appreciate how open you are to feedback and I know you're going to do well in this area." *Id.* at 28. On April 4, 2018, an agent emailed Shelton to "commend" plaintiff for thinking "outside the box" and for "go[ing] the extra mile to resolve an issue." Doc. 61-17 at 1. On May 1, 2018—16 days before plaintiff's final warning—Canton described a recent "'coaching' experience" with plaintiff, where she and Shelton "were able to see quick results in terms of the employee acceptance and ownership." Doc. 61-26 at 1. On May 7, 2018, Shelton sent plaintiff a message that he had "noticed some good improvements in your small talk and tone on the phone today." Doc. 54-11 at 14. On May 10, 2018, Shelton emailed plaintiff about his phone metrics and said, "[t]his is fantastic! Nice work sir," and, "[y]ou're really supporting our team more than you know with phone metrics." Doc. 61-18 at 1. In a June 13, 2018 meeting between Shelton and Canton, Shelton told Canton that plaintiff had accepted and implemented Shelton's feedback. Doc. 61-4 at 7. On June 24, 2018, Shelton wrote to plaintiff, "[y]ou're a rockstar sir and I truly appreciate how you're already implementing these positive steps." Doc. 61-2 at 9. On July 19, 2018, an agent emailed Shelton praising plaintiff for "[going] out of his way" to solve a problem and noted that "[i]t is unusual to find that kind of dedication." Doc. 61-19. Canton testified that on October 19, 2018, Sims told her that plaintiff took a call where an agent spoke to plaintiff rudely, and plaintiff handled the call well and showed "emotional resiliency." Doc. 61-4 at 19.

     On June 22, 2018, defendant recognized plaintiff as a "certified author," which is a designation achieved by a relatively small number of employees. Doc. 61-6 at 2–4. The testimony about this designation's meaning is far from clear, but Canton testified that it involves a "process . . . where advocates can create knowledge to share with others . . . ." Doc. 61-6 at 2. Plaintiff also received numerous "Perfect 10" awards in recognition of his performance. *See, e.g.*, Doc. 61-15 at 1–2. A "Perfect 10" award means that an agent rated the employee highly in all areas.

[8]     An "Interaction Log" is "an official record intended to document discussions with employee[s]." Doc. 54-11 at 1. Shelton testified that supervisors record information such as conversations or "coaching" with an employee, an employee arriving late for work, or good things about the employee. Doc. 61-2 at 26.

phone." Doc. 54-11 at 11. On April 13, 2018, Shelton recorded in the Log that he spoke with plaintiff about how he "seems to be doing a little better" and again about "not letting his frustration show through the call." *Id.* On April 26, 2018, Shelton wrote in the Log that he "spoke [with plaintiff] in great detail about his tone, cutting people off, and not empathizing."[9] *Id.* On May 7, 2018, Shelton recorded in the log that he and plaintiff "spoke in great detail about the same three things [. . .] empathy, tone, cutting people off." Doc. 54-11 at 15; Doc. 54-1 at 57–58. Shelton recorded that he "advised [plaintiff] that if his tone, empathy, and cutting people off doesn't stop, it will result in corrective action." Doc. 54-11 at 15. On May 10, 2018, Shelton emailed Reeves—his supervisor—that he had "coached [plaintiff] as much as [he could], so now [he is] in an observation period to see if [plaintiff] responds to the coaching or keeps with his ways . . . ." Doc. 54-19 at 1. He also told Reeves he was "[w]orking with the team to focus on empathy." *Id.*

### *Defendant Gives Plaintiff a Final Warning*

On May 17, 2018, plaintiff refused to accept a document an agent had submitted to support a policy change request. Plaintiff emailed Shelton the document at issue because the agent had asked for a supervisor to call her. Shelton reviewed the document, deemed it acceptable, and told plaintiff to accept it.[10] Plaintiff then emailed Shelton a list of reasons why he disagreed with this decision. Doc. 54-20 at 1. Shelton recorded in the Interaction Log that he

---

[9]     Plaintiff sent Canton an email on May 3, 2018 complaining that his meeting plaintiff had with Shelton the week before was "pretty clear retaliation" for plaintiff's meeting with Canton. Doc. 61-27 at 1. Plaintiff's email never specifies that he is referring to this April 26 meeting, but nothing in the summary judgment record suggests that Shelton and plaintiff had another meeting that week. In any event, plaintiff had a meeting with Shelton that plaintiff perceived as retaliatory.

[10]     In reviewing the document at issue, Shelton testified that he conducted a Google search to determine whether the document was acceptable. Defendant had no policy that directed employees to conduct this kind of research when evaluating documents.

called plaintiff to his desk to "talk about how [he] came to [his] conclusion." Doc. 54-11 at 18. Shelton testified that plaintiff "stood up in the middle of the conversation," he "got up and walked off."[11] Doc. 54-2 at 15. On May 17, 2018, defendant issued plaintiff a final warning. Doc. 54-21. According to Shelton, the final warning resulted from plaintiff's performance issues and his behavior during their May 17 meeting. Doc. 54-2 at 14. Shelton issued plaintiff's final warning, and Sims—who later became plaintiff's supervisor in September 2018—also attended the meeting. Shelton testified that he wanted Sims there because he "was delivering a final [warning] and I generally always want somebody to be there." Doc. 61-2 at 19. The warning read, in part:

> In addition to the coaching provided to you by your previous supervisor, you have been coached on multiple occasions over the past two months about emotional resilience, accepting and applying feedback to grow, as well as creating a low effort experience for our agents. Despite this ongoing coaching, you have not made improvements in these areas and you are not meeting expectations. I've offered you opportunities to grow, by speaking in team huddles and outlining documents to streamline our processes, to which you declined.

> Your continued lack of professionalism shows through your interactions with others; including the agents as well as with your direct supervisor. This behavior also creates a negative work environment with your peers. When you are approached with constructive feedback, you give pushback, you become argumentative, and are unwilling to accept the coaching. This lack of response to feedback resulted in an additional coaching on 5/17/18, in order to highlight how to create a low effort experience. Your behavior during this coaching session was unprofessional and you displayed behaviors of insubordination. This further demonstrates your lack of openness and unwillingness to take constructive feedback to help you grow. To further detail what happened, see my recap of the coaching session below:

> When trying to help you better understand my thought process on thinking outside the box to make the agent[']s experience easier on a specific transaction, you made

---

[11] Shelton testified that he didn't "have any idea" whether plaintiff thought the meeting was over when he left. Doc. 61-2 at 25. Plaintiff emailed Shelton the next day saying that "i[n] the final write up you said that the conversation was not over, in real[ity] . . . it was, you said you were going to accept [the document]." Doc. 54-22 at 3.

comments to me that display an extreme lack of professionalism.  You also got up and walked out of our coaching session before it was over.

Doc. 54-21 at 1.  A final warning is the last step before termination in defendant's progressive discipline process.  A final warning prevents an employee from moving to another position within the company, prevents him from receiving tuition reimbursement from defendant, and can affect his performance rating, which could affect his annual bonus or merit increases.  Shelton never had issued plaintiff any written warnings or discipline before this final written warning on May 17, 2018.  Shelton knew he could have disciplined plaintiff less severely.  Supervisors must consult with Human Resources before issuing a final written warning.  Defendant's Human Resources consultant Amy Canton testified that a supervisor issuing a final warning directly— without prior discipline—depends on the situation, but does not occur often.  Doc. 61-4 at 17. Canton testified that defendant has had several employees besides plaintiff who have struggled with "emotional resilience."  *Id.* at 11–12.  She testified that could not remember an instance where an "emotional resilience" issue itself resulted in corrective action.  *Id.* at 12.  And, none of plaintiff's coworkers had complained to Human Resources about plaintiff's behavior creating a negative work environment.

### *Plaintiff's EEOC Charge and Lawsuit*

On May 21, 2018, plaintiff filed an EEOC Charge alleging that (1) in April 2018, defendant denied him the AU position because of his sex, and (2) in May 2018, defendant issued him a warning in retaliation for his complaint to Human Resources.  *See* Doc. 54-23 at 1 (EEOC Charge).  The EEOC mailed the Right to Sue Letter to Canton at defendant's address on August 1, 2018, and she received it on August 2, 2018.

Plaintiff mailed his Complaint in this case, along with a form waiving service, to defendant on October 19, 2018.  When defendant received this notice of the lawsuit, defendant's

practice called for a support employee to deliver the lawsuit materials to one of three Human Resources employees, including Canton. Canton was the only Human Resources employee who oversaw the Olathe Service Center.

### *Defendant Terminates Plaintiff*

In September 2018, plaintiff began reporting to Curt Sims.[12] On October 22, 2018, plaintiff received a call from an agent requesting a retroactive discount on a policy. Plaintiff told the agent that he could not backdate the discount without proper documentation. The agent then asked who she could talk to "to get that approved," and plaintiff responded, "what do you mean?" Doc. 61-9 at 7:30. The agent asked who she could talk to about having the discount backdated, and plaintiff explained that defendant had not yet received the necessary documentation. The agent stated that she called to find out whether the discount could be backdated, and asked who she could talk to about backdating the discount. Plaintiff explained to her, "you're talking to me. We won't be able to backdate it," and that plaintiff would add the discount when he received proper documentation. *Id.* at 8:00. The agent again asked plaintiff about having the discount backdated, because "the other girl" had told her somebody could

---

[12]    Sims and plaintiff's former supervisor—Shelton—communicated about plaintiff's performance. On June 1, 2018, Sims sent a message to Shelton telling him to listen to a call plaintiff had made. Doc. 61-20. The next week, Sims sent Shelton another message asking if anything had happened with plaintiff's call the week before. On June 28, 2018, Sims sent Shelton a message about a call plaintiff had made, and that he was "[j]ust passing [it] along to" Shelton. Doc. 61-25 at 1. Soon after, plaintiff began reporting to Sims. Shelton and his supervisor decided plaintiff would report to Sims, and plaintiff had no say in the matter. On September 14, 2018, Sims sent Shelton a message that he wanted to wanted to talk to Shelton because he "[j]ust ha[d] some questions on [plaintiff]." Doc. 61-22. And, on September 25, 2018, Sims sent Shelton a message saying it "looks like there needs to be a little coaching session with [plaintiff]" after a call. Doc. 61-23. On October 23, 2018, Sims sent Shelton a message asking him how to create a certain kind of report, and about plaintiff's October 22, 2018 call (the cited reason for plaintiff's termination). Shelton testified that he did not remember another instance where he had conversations with other managers about an employee who he did not supervise. And, Shelton testified, he did not remember another instance where another supervisor asked him to listen to another employee's calls and provide feedback about those calls. Doc. 61-2 at 24.

approve backdating the discount. *Id.* at 8:15. Plaintiff told her, "you would be talking to me," and that the agent had not met the requirements for backdating. *Id.* at 8:19. The agent asked whether she could talk to someone else about the issue. Plaintiff asked the agent who she would like to speak to, and she told him, "maybe your supervisor." *Id.* at 8:32.

Plaintiff told the agent—accurately—that he believed his supervisor was in a meeting, and offered to have him call her. The agent asked for plaintiff's supervisor's voicemail. Plaintiff told her—inaccurately—that he did not believe his supervisor had set up his voicemail. Plaintiff testified that he never had transferred an agent to voicemail before, and he feared disconnecting the call if he tried to transfer the agent as requested. Doc. 61-1 at 4–5. The agent told plaintiff she would call back and speak to someone else when she had the documents. She told plaintiff it was ridiculous he would not apply the discount. Plaintiff apologized that the agent thought it was ridiculous, and gave the agent his name before the agent disconnected the call. Plaintiff never told Sims about the call.

On October 24, 2018, Sims and Cintia Mazzetta (another supervisor) met with plaintiff about the October 22 call with the agent. Sims and Mazzetta played the call for plaintiff. Sims then asked whether anything about the call alarmed plaintiff, and plaintiff responded, "not really." But, at the end of the discussion, plaintiff acknowledged that the phone call "was definitely a stand[ ]-out phone call[ ] that [he] had during the day." Doc. 61-9 at 30:18. He admitted that he could have handled the call better, such as by looking at the County Assessor's website for the necessary information. *Id.* at 32:35. He acknowledged that the agent had expressed frustration at the end of the call. *Id.* at 23:45.

In the meeting, Sims acknowledged that plaintiff had followed defendant's guidelines for backdating discounts.[13]  *Id.* at 11:50.  Sims told plaintiff that if an agent wanted to speak to a supervisor and Sims was unavailable, plaintiff should contact another supervisor in Olathe or at another location, even though defendant never had trained plaintiff that he should transfer calls to another location.  At the end of the meeting, Sims told plaintiff that their meeting was a "coaching opportunity," and that plaintiff should listen to, reflect on, and apply the feedback he had provided to plaintiff.  *Id.* at 35:30.  Sims testified that this incident alone—without the prior final warning—created no reason for termination.  Doc. 54-6 at 6.  When provided with an example (*see* Doc. 61-16 at 1) of an employee communicating the same information about backdating that plaintiff had provided to the agent, Sims testified there was no reason to discipline or terminate that employee.  Doc. 54-6 at 6.  He testified that plaintiff's case warranted termination because it was "repeated behavior."  *Id.*

On October 25, 2018, Sims wrote a memorandum seeking support for his decision to terminate plaintiff.  In the "Reason for Termination Recommendation" section of the memo, Sims explained, in part:

> [Plaintiff] was placed on a final warning on May 17, 2018 for policy violation regarding his emotional resilience, accepting/applying feedback and his professionalism and conduct with agents as well as his direct supervisor.  While reviewing a call that [plaintiff] received from an agent on October 22, 2018, he showed no resilience during the coaching session as to what could have been improved or changed during the interaction.  From his viewpoint, it was a typical call with our customers.  When the agent asked for a supervisor, he did not seek guidance and did not provide this information to leadership concerning the interaction nor the request for a supervisor.

---

[13]  Mazzetta told plaintiff, "[y]ou have a guideline that's telling you no . . . but what did you do differently?  And that's what's going to set you apart from other people.  Right?  Everybody can follow guidelines, but how are you going to help the agent?"  Doc. 61-9 at 17:45.

Doc. 54-25 at 1. Sims testified that a lack of "resilience during the coaching session" meant that plaintiff had failed to see how he could have handled the call differently. Doc. 54-6 at 13. On October 25, 2018—six days after plaintiff filed his Complaint in this lawsuit—defendant terminated plaintiff.[14] Sims testified that he didn't know plaintiff had filed an EEOC Charge or a lawsuit before he terminated plaintiff's employment. Doc. 54-6 at 16. Canton testified that she, too, didn't know plaintiff had filed a lawsuit before Sims terminated plaintiff's employment. Doc. 54-4 at 8.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995). When it applies this standard, the court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is 'genuine' if 'the evidence allows a reasonable jury to resolve the issue either way.'" (quoting *Haynes v. Level 3 Commc'ns, LLC*,

---

[14] Plaintiff mailed the Complaint to defendant on October 19, 2018. Defendant's practice called for its Support Services employees to deliver the Complaint to someone in Human Resources. Canton oversaw Human Resources for the Olathe Service Center. On October 24 or 25, 2018—before plaintiff's termination—plaintiff's affidavit testified that plaintiff saw Canton leave her office and visit Sims' desk. Doc. 61-8 at 2 (Pl. Aff. ¶ 13). Plaintiff's affidavit asserts that plaintiff "almost never saw [Canton] come out of her office and over to that area." *Id.*

456 F.3d 1215, 1219 (10th Cir. 2006)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Nahno-Lopez*, 625 F.3d at 1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim." (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Finally, summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.    Analysis

Plaintiff has asserted two Title VII claims—discrimination based on sex and retaliation—against defendant. Doc. 50 at 7–8. Specifically, plaintiff alleges that defendant denied plaintiff promotions and terminated his employment because he failed to conform to male sex stereotypes. *Id.* at 7. And, plaintiff alleges, defendant retaliated against plaintiff twice by (1) issuing him a final warning after he reported discrimination to Human Resources, and (2) terminating him after he filed his EEOC Charge and this lawsuit. *Id.* at 7–8. The court addresses each claim, in turn below.

### A.  Plaintiff's Discrimination Claim

"Title VII of the Civil Rights Act of 1964 prohibits, among other things, unlawful employment discrimination on the basis of an individual's sex." *Tabor v. Hilti*, 703 F.3d 1206, 1216 (10th Cir. 2013) (internal citations and quotations marks omitted). A plaintiff may assert a Title VII claim for unlawful gender stereotyping based on an employer's discrimination "against [the plaintiff] based on [his] failure to confirm to stereotypical gender norms." *Potter v. Synerlink Corp.*, 562 F. App'x 665, 674 (10th Cir. 2014) (first citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), *superseded on other grounds by statute*, 42 U.S.C. § 2000e-2(m), *as recognized in Burrage v. United States*, 571 U.S. 204, 213 n.4 (2014); then citing *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1223 (10th Cir. 2007)). A plaintiff may prove discrimination through direct evidence or circumstantial evidence that creates an inference of intentional discrimination. *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th

Cir. 2015). Here, plaintiff argues he has adduced both direct and circumstantial evidence of discrimination. The court considers each argument, in turn, below.

### 1. Direct Evidence

Plaintiff asserts he has adduced direct evidence of discrimination. Plaintiff asserts that Radliff's comment that he might hire plaintiff "in a different set of circumstances if he already has 'a bunch of alphas over there'" refers to plaintiff's failure to conform to male sex stereotypes. Doc. 61 at 65. Plaintiff asserts that this statement is direct evidence of discrimination because Radliff made the comment in the context of telling plaintiff why he did not select him for an AU position. *Id.* at 65–66.

"When a plaintiff offers direct evidence of discrimination in a Title VII claim, [his] claim may move forward without being subjected to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green . . . .*" *Tabor v. Hilti*, 703 F.3d at 1216 (citation omitted); *see Ramsey v. City and Cty. of Denver*, 907 F.2d 1004, 1007–08 (10th Cir. 1990) ("'[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.'" (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985))). "Direct evidence is evidence that, on its face, demonstrates that the employment decision was reached for discriminatory reasons." *Didier v. Abbott Labs.*, 614 F. App'x 366, 372 (10th Cir. 2015) (citing *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002)). "The classic example of direct evidence of discrimination comes from *Trans World Airlines*, where the Supreme Court held that an explicit, mandatory age requirement was direct evidence of age discrimination." *Tabor*, 703 F.3d at 1216 (citing *Trans World Airlines*, 469 U.S. at 121).

"Comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted

on his or her discriminatory beliefs." *Id.* (citing *Ramsey*, 907 F.2d at 1008). "[D]iscriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision." *Id.* (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007)). *See also Perry v. Woodward*, 199 F.3d 1126, 1134 (10th Cir. 1999) (holding that when a plaintiff alleges direct evidence of discrimination, the plaintiff must establish a nexus between the allegedly discriminatory comments and the termination). And, "if the content and context of a statement allow it to be plausibly interpreted in two different ways— one discriminatory and the other benign—the statement does not qualify as direct evidence." *Tabor*, 703 F.3d at 1216.

Plaintiff argues that a nexus exists between Radliff's allegedly discriminatory comment and the adverse employment action. Doc. 61 at 66. That is, Radliff made the "alpha" comment while explaining to plaintiff why he had not selected plaintiff for an AU position. *Id.* And, plaintiff asserts, the context and manner in which Radliff made the comment make it direct evidence of discrimination. *Id.* Plaintiff asserts that Radliff's insistence on meeting with plaintiff in person to provide feedback—rather than doing so over email, as plaintiff requested— suggests that Radliff knew the discriminatory nature of the comment and wanted to avoid a record of it. *Id.*

Defendant responds that the "alpha" comment doesn't qualify as direct evidence. Doc. 54 at 25–26. Defendant asserts that Radliff made the "alpha" comment about leadership skills and abilities, not about sexual stereotypes or a failure to conform of them. *Id.* And, under *Tabor*, "if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and one benign—the statement does not qualify as direct evidence." *Id.* (citing *Tabor*, 703 F.3d at 1216). Defendant thus contends that the "benign"

interpretation of "alpha" (*i.e.*, a reference to leadership ability) defeats plaintiff's direct evidence argument. *Id.* at 26.

The court agrees with plaintiff that a link must exist between the alleged discriminatory comment and the adverse employment action. *See Tabor*, 703 F.3d at 1216 (explaining that "discriminatory statements do not qualify as direct evidence if the context or timing of the statement is not closely linked to the adverse decision."); *see also Riggs*, 497 F.3d at 1118 (holding that plaintiff failed to produce direct evidence of discrimination because no "direct link" existed between the alleged discriminatory conduct and termination); *Perry*, 199 F.3d at 1134 (holding that when a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination, he must show a "nexus" between the statements and the decision to terminate plaintiff). But plaintiff focuses on this requirement only. This link between an alleged discriminatory statement and the adverse employment is necessary—but it's not the only consideration when deciding whether evidence qualifies as direct evidence of discrimination. *See, e.g.*, *Tabor*, 703 F.3d at 1216 (holding that, to qualify as direct evidence, maker of discriminatory comments must have had decisionmaking authority and acted on her discriminatory beliefs, and also that a comment fails as direct evidence if there is a plausible, "benign" interpretation for it).

*Tabor* provides an example of direct evidence of sex discrimination. In that case, a female applicant had applied for another job within her company. 703 F.3d at 1213. During the interview, the manager "made a number of statements" about the applicant's gender. *Id.* He told her that "tools are like guns for men and using them is almost like second nature." *Id.* (internal citation and quotation marks omitted). He told her it would "take more work for her, as a woman, to learn the tools well enough to demonstrate them for customers . . . ." *Id.* (citation

omitted).  The Circuit held that the manager's explicitly stated view that women possessed an inferior knowledge of tools and inferior ability to sell tools constituted direct evidence of discrimination.  *Id.* at 1217.  The Circuit reasoned that these "statements spoke directly to central requirements of the job," and the manager "made them during a discussion about [plaintiff's] fitness for the position."  *Id.*

Here, Radliff made the "alpha" comment in the context of explaining why he had not hired plaintiff for an AU position.  But commenting that he "may not need an alpha" in the future does not explicitly state anything discriminatory about plaintiff's failure to conform to male sex stereotypes.  Unlike *Tabor*, Radliff never stated any sex-based reason that plaintiff was less qualified for the job than other candidates.

Plaintiff counters, asserting that defendant interprets *Tabor* incorrectly.  Plaintiff argues that the rule in *Tabor*, *i.e.*, that a statement with a plausibly benign interpretation is not direct evidence of discrimination, conflicts with the Supreme Court's ruling in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), overruled on other grounds by 42 U.S.C. §§ 2000e–2(m), 2000e–5(g).  Plaintiff argues that *Price Waterhouse* recognized a comment that a female manager needed to "take a course at charm school" and criticism of her use of profanity qualified as direct evidence of discrimination because the comments occurred during a discussion about why the employer had denied her promotion to partner status.  Doc. 61 at 66 (quoting *Price Waterhouse*, 490 U.S. at 235).  Plaintiff argues that both statements have a non-discriminatory interpretation. So, plaintiff argues, defendant's interpretation of *Tabor* conflicts with *Price Waterhouse*.

Plaintiff misapprehends *Price Waterhouse*.  Plaintiff is correct—there was direct evidence of discrimination in *Price Waterhouse*.  But—as the Supreme Court explained—the evidentiary "*coup de grace*" was that a partner told the female manager that to improve her

chances for partnership, she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 490 U.S. at 235 (internal citation and quotation marks omitted). The Supreme Court considered the "charm school" comment and criticism about her use of profanity as one of many "clear signs . . . that some of the partners reacted negatively to [her] personality because she was a woman." *Id.* But the Court never considered whether those statements—alone—constituted direct evidence of discrimination. And in this case, the alleged discriminatory comment here falls far short of the statements in *Price Waterhouse*.

Plaintiff contends that Radliff's "alpha" comment unmistakably and unambiguously referenced plaintiff's failure to conform to male sex stereotypes. This argument is unpersuasive. One plausibly can interpret the comment as a reference to leadership skills—a nondiscriminatory meaning. Since the statement has a plausible non-discriminatory interpretation, it fails to qualify as direct evidence. *See Tabor*, 703 F.3d at 1216 (holding that "if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence").

## 2. Circumstantial Evidence

Finding that plaintiff has adduced no direct evidence of discrimination, the court applies the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (citing *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011)). First, the plaintiff must establish a prima facie case of discrimination. *Id.* This requires a showing that: (1) "[he] is a member of a protected class," (2) "[he] suffered an adverse employment action, and" (3) "the challenged action occurred under circumstances giving rise to an inference of discrimination."

*Bennett*, 792 F.3d at 1266.  Plaintiff's burden at this stage is "not onerous."  *Potter*, 562 F. App'x

at 674 (internal quotation marks and citation omitted).

Next, if plaintiff satisfies this prima facie burden, the burden shifts to defendant to

articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Crowe*,

649 F.3d at 1195.  And, last, where defendant discharges this burden, the burden shifts back to

plaintiff.  In this third stage, plaintiff must show that defendant's proffered reasons for its actions

are pretextual.  *Id.* (citing *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1249 (10th Cir. 2006)).

### a.  Prima Facie Case

Defendant asserts that there is no triable issue here because plaintiff has failed to

establish a prima facie case of discrimination.  Defendant argues that plaintiff has produced no

evidence to support the inference that plaintiff fails to conform to male sex stereotypes or that

any such failure resulted in adverse employment action.  Doc. 54 at 28.  Plaintiff responds,

asserting he has made a prima facie case of sex discrimination based on evidence of his failure to

conform to male sex stereotypes and Radliff's "alpha" comment.[15]  Doc. 61 at 68.

Plaintiff satisfies the first two elements of his prima facie case because he is male, and

defendant both denied him a promotion and terminated him.  *See, e.g.*, *Oncale v. Sundowner*

*Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (noting that the Title VII sex discrimination

---

[15]     Defendant also argues in this section of its Memorandum that "a gender stereotyping claim
should not be used to bootstrap protection for sexual orientation into Title VII."  Doc. 54 at 28 (citing
*Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005) (holding that Title VII protections
do not extend to harassment based on a person's sexuality).  Plaintiff responds, contending that "the law
on this question is quickly evolving," but concedes that "Title VII does not directly prohibit
discrimination because of sexual orientation."  Doc. 61 at 70.  Plaintiff asserts, however, his claim should
advance beyond the first stage of the *McDonnell Douglas* analysis because his "sexual orientation is *not*
the only way in which he fails to conform to sex stereotypes, and he has made a prima facie case without
it."  *Id.* at 71.  The court thus considers plaintiff's claims without considering his sexual orientation.  *See*
*Etsitty*, 502 F.3d at 1222 (Title VII protects employees only if they are discriminated against because they
are male or because they are female).

21

prohibition protects both men and women); *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032–33 (10th Cir. 2004) (holding that "adverse employment action" includes acts such as hiring, firing, and failing to promote). The parties dispute, however, whether the circumstances of the adverse employment action, *i.e.*, denying plaintiff the AU position and his termination, raise an inference of discrimination. Defendant asserts that, other than plaintiff's own belief, nothing suggests that defendant denied him an AU position or terminated his employment because of his purported failure to conform to male sex stereotypes. Doc. 54 at 27. And, defendant argues, plaintiff has adduced no evidence that any of defendant's employees even viewed him as failing to conform to male sex stereotypes. *Id.* Plaintiff responds that he has adduced evidence that he fails to conform to male sex stereotypes. Specifically, he asserts, he "fail[s] to conform to sex stereotypes in ways that were noticeable [to] his coworkers, including the way [he] dressed, the way he presented himself, and the way he acted."[16] Doc. 61 at 69.

Defendant maintains, however, that plaintiff's self-serving affidavit is insufficient to avoid summary judgment. Doc. 54 at 28 (first citing *Wright v. Wyandotte Cty. Sheriff's Dep't*, 963 F. Supp. 1029, 1036 (D. Kan. 1997) (concluding that plaintiff's subjective feeling and "mere conjecture" that her employer had discriminated against her were insufficient to avoid summary judgment); then citing *Arzate v. City of Topeka*, 884 F. Supp. 1494, 1501 (D. Kan. 1995) (holding that plaintiff's own belief or feeling that he was the victim of disparate treatment is insufficient, standing alone, to preclude judgment as a matter of law); then citing *Money v. Great*

---

[16]     In his affidavit, plaintiff testified that plaintiff "did not conform to stereotypes of how males behave and act in a way that was noticeable to [his] coworkers." Doc. 61-8 at 1 (Pl. Aff. ¶ 3). His affidavit testified that he dressed in a "stylish and fashionable" manner that "did not conform to the way males stereotypically dressed," was "attentive to [his] appearance and hygiene and kept [his] desk very tidy" in a way that "fail[ed] to conform to stereotypes of male behavior," and "socialized primarily with [his] female co-workers while most male co-workers socialized with other male co-workers, in a way that fail[ed] to conform to stereotypes of how males behave." *Id.* at 1–2 (Pl. Aff. ¶¶ 4–6).

*Bend Packing Co., Inc.*, 783 F. Supp. 563, 574 (D. Kan. 1992) (holding that plaintiffs' reliance on their own unsupported allegations is inappropriate to defeat defendants' motions for summary judgment, and plaintiffs' "feeling" that they were victims of discrimination fails to demonstrate a material issue of fact in the absence of supporting evidence)).

The court assumes, without deciding, that plaintiff has satisfied his prima facie burden. Even if plaintiff could make out a prima facie case of discrimination on this summary judgment record, the court concludes below that his claim cannot survive summary judgment because the undisputed facts fail to present a triable issue whether defendant's decision not to hire plaintiff for the AU position and to terminate his employment was pretextual.

### b. Legitimate, Non-Discriminatory Reason

Next, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for not hiring plaintiff for the AU position and, later, for terminating his employment. To meet its burden under the second step of the burden-shifting framework, "defendant need only 'explain its actions against the plaintiff in terms that are not facially prohibited by Title VII.'" *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (quoting *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992)). Defendant explains that Radliff selected two candidates for the AU positions who were more qualified than plaintiff because they had more relevant experience and leadership skills. Doc. 54 at 29. And, defendant asserts it terminated plaintiff's employment because of poor work performance that culminated in the October 22, 2018 phone call where plaintiff was rude to an agent. Doc. 54 and 33–34. Defendant's proffered reasons satisfy its burden under the second step of the burden-shifting framework.

### c. Pretext

The burden thus shifts back to plaintiff, requiring him to establish a genuine issue for trial whether defendant's articulated reason was pretext for discrimination. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Id.* (citations and internal quotations marks omitted). A plaintiff can satisfy this burden "by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (citation and internal quotation marks omitted).

Plaintiff directs the court to several facts that, he contends, establish triable issue of pretext. First, plaintiff asserts, Radliff's reasons for not hiring plaintiff are inconsistent. Doc. 61 at 73. When giving plaintiff feedback on his interview, Radliff said that developing a relationship with hiring managers is valuable and that plaintiff never had interacted with him before the interview. But Radliff never had contact with the two candidates he hired for the AU positions. *Id.* Radliff also told plaintiff that he lacked the leadership qualities Radliff had sought, yet Radliff checked the box on the Interview Guide that plaintiff had "demonstrated" teamwork and leadership during his interview, and, in any event, the AU position was not a "leadership position." *Id.*

The court finds that the summary judgment facts present no triable issue here. Plaintiff sought feedback from Radliff about his interview for the AU position. Radliff met with plaintiff and pointed out that plaintiff never had interacted with him before the interview. He told plaintiff that developing a relationship or rapport with hiring managers before a job posts is a

"valuable opportunity." Doc. 61-10 at 3:02. Plaintiff portrays the fact that Radliff had no prior relationship or contact with the candidates he hired for the AU positions as pretext for a discriminatory motive. Doc. 61 at 73. He attempts to cast Radliff's advice as some sort of job requirement that Radliff violated by hiring the other two candidates. But no reasonable trier of fact plausibly could interpret Radliff's comment as evidence of pretext. Radliff never said or implied that a prior relationship was required for the role. Nor did Radliff suggest he had any prior relationship with the candidates he selected. He merely explained to plaintiff that he never had interacted with plaintiff before the interview, and that having a relationship with a hiring manager could help plaintiff secure a future promotion. No reasonable trier of fact could find that Radliff's comment was anything more than advice for plaintiff about the best way to advance his career within defendant's organization.

Similarly, the court is unpersuaded that a reasonable trier of fact could find Radliff's comment to plaintiff that he had not demonstrated sufficient leadership qualities in the interview was pretext. Just because Radliff checked the box that plaintiff had demonstrated teamwork or leadership skills in his interview does not mean that plaintiff better demonstrated leadership skills than the candidates Radliff selected, or that leadership skills were Radliff's only consideration in the interview. And, though the AU position was not a "leadership position," Radliff reasonably could have considered leadership skills in the interviews. The Tenth Circuit has cautioned courts that they "'may not second guess the business judgment of the employer.'" *DePaula*, 859 F.3d at 970 (quoting *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017)); *see also Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) ("The court may not act as a super personnel department that second guesses employers' business judgments." (citation and internal quotation marks omitted)). Contrary to plaintiff's argument,

no reasonable trier of fact could find a meaningful inconsistency in Radliff's explanation for why he did not hire plaintiff for the AU position.

Next, plaintiff contends that a jury reasonably could infer that some or all of defendant's reasons for not hiring plaintiff were false because Radliff wanted to have an in-person conversation with plaintiff about his interview. Plaintiff contends that Radliff wanted to avoid providing feedback by means that would create a record, such as email or online chat. It is accurate that plaintiff requested that Radliff send plaintiff interview feedback by email, and that Radliff insisted on having an in-person conversation with him. But plaintiff's conclusion that Radliff's reasons for not hiring plaintiff were false requires the factfinder to draw two inferences—first, that Radliff wanted an in-person conversation to avoid creating a record, and second, that Radliff wanted to avoid creating a record because the reasons he articulated were false. Plaintiff has adduced no evidence suggesting that either of these inferences is plausible. The court is unpersuaded that this argument presents a triable issue. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (holding that "plaintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.").

To survive summary judgment, plaintiff need not necessarily adduce evidence that he was more qualified than the selected candidates.[17] *See Officer v. Sedgwick Cty., Kan.*, 226 F.

---

[17]     Defendant also argues that it is entitled to summary judgment because plaintiff has failed to show he was more qualified than the candidates selected for the AU positions. Doc. 54 at 32–33. Plaintiff responds that he need not establish he was more qualified than the other candidates, because he never has tried to show pretext by this theory. Doc. 61 at 74; *see Laul v. Los Alamos Nat'l Labs.*, 765 F. App'x 434, 441 (10th Cir. 2019) ("To prove pretext on the theory he was better qualified than the other candidates, [plaintiff] must proffer evidence of an 'overwhelming disparity' between his qualifications and those of the successful candidate . . . ."). Here, plaintiff testified that he didn't know whether he was more qualified than the two candidates Radliff selected. Plaintiff's Opposition never argues that he was more qualified than the selected candidates. Since plaintiff never relies on the theory that he was more

App'x 783, 789 (10th Cir. 2007) ("[A] plaintiff may prove that a defendant's stated reasons are pretextual in a variety of ways; a plaintiff is not 'forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual.'" (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (further citation omitted)). But plaintiff still must make a showing of pretext for his claims to survive summary judgment. And here, plaintiff relies on just one contrived argument: that defendant's reasons are inconsistent. No reasonable trier of fact could find that Radliff's comment that plaintiff never had interacted with him before the interview—despite Radliff never having interacted with the two candidates he hired before the interview—was pretextual. Nor could any reasonable trier of fact find that Radliff's assertion that plaintiff failed to demonstrate leadership skills was pretextual, based only on evidence that Radliff had checked a box that plaintiff had demonstrated teamwork and leadership in his interview, and that the AU position was not a "leadership position." The fact that Radliff insisted on giving plaintiff feedback in person—rather than by means that would create a written record—raises no plausible inference that Radliff's reasons for not hiring plaintiff were false. Plaintiff can't establish pretext with pure speculation. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1238 (10th Cir. 2015) (affirming summary judgment against plaintiff's Title VII claim because plaintiff "merely advanced speculative theories" that failed to demonstrate pretext); *see also Webster v. Shulkin*, 707 F. App'x 535, 542 (10th Cir. 2017) (holding that where plaintiff hasn't discredited employer's nondiscriminatory explanation, plaintiff's "claims don't rise above the level of speculation, which is insufficient to demonstrate pretext").

---

qualified than the selected candidates, he need not prove that he was more qualified than the other candidates to survive summary judgment.

Finally, plaintiff's Opposition never asserts that defendant's reason for terminating plaintiff was a pretext contrived to hide discrimination. Plaintiff's Opposition addresses only defendant's failure to hire him for the AU position. *See* Doc. 54 at 72–75. Plaintiff thus has waived any claim that defendant terminated him for discriminatory reasons. *See Jones v. Rent-A-Center, Inc*., 240 F. Supp. 2d 1167, 1176 (D. Kan. 2002) (holding plaintiff abandoned her claims when she provided no legal argument or authority in her summary judgment response).

Plaintiff has failed to shoulder the burden imposed on him at the pretext level of the analysis. He has not adduced admissible evidence of a plausible basis for a finding "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in defendant's reasons for not promoting plaintiff. *DePaula*, 859 F.3d at 970 (citation and internal quotation marks omitted). The court thus grants defendant summary judgment against plaintiff's discrimination claim.

### B. Plaintiff's Retaliation Claim

Defendant also has moved for summary judgment against plaintiff's retaliation claim. Plaintiff bases his retaliation claim on his final written warning and his termination, and he argues this claim should survive summary judgment. Doc. 61 at 75.

Title VII prohibits retaliation against an employee because he has opposed any practice forbidden under Title VII. *Lounds*, 812 F.3d at 1233. "A plaintiff bringing a retaliation claim must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." *Id.* (internal citations, quotation marks, and alteration omitted). Plaintiff "may either (1) offer direct evidence that retaliation 'played a motivating part' in an employment decision adverse to [his] interests, or (2) rely upon circumstantial evidence under 'the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation.'" *Id.* (quoting *Fye v. Okla. Corp. Comm'n*, 516

F.3d 1217, 1225 (10th Cir. 2008) (further citations omitted)).  The court first considers whether plaintiff's retaliation claim based on the final written warning supports a triable issue.  The court then considers the same question for the retaliation claim based on plaintiff's termination.

### 1.  Final Written Warning

The court begins by considering plaintiff's argument of direct evidence that defendant unlawfully retaliated against him by issuing him a final written warning.  The court then turns to plaintiff's theory relying on circumstantial evidence of retaliation using the *McDonnell Douglas* framework.

### a.  Direct Evidence

Plaintiff asserts that he has adduced direct evidence that defendant issued him a final warning in retaliation for his discrimination complaint.  Doc. 61 at 75.  Specifically, plaintiff asserts that Canton—defendant's Human Resources manager—admitted in her deposition that defendant issued plaintiff a final warning in retaliation for his discrimination complaint.  *Id.* Plaintiff cites Canton's testimony to support his argument:

> Q:  Okay.  And so prior to the EEOC charge, did you resolve [plaintiff's] complaint?
>
> A:  I felt as though his concerns were resolved after we had gone through the providing information to him from Talent Acquisition offering to meet with him and [Shelton] to discuss further.  Ultimately, he did end up on a final warning, but he had the door open with Karilynn, his director, so based off of Karilynn sharing with me how that conversation went, I felt as though those concerns were resolved.

Doc. 61-4 at 9–10.  Plaintiff's direct evidence argument goes like this:  Plaintiff's email to Canton complained that supervisors repeatedly had denied him promotions.  *See* Doc. 54-17 at 2–3.  A final written warning prevents an employee from moving to other positions within the company.  Thus, plaintiff reasons, the final written warning "'resolved' plaintiff's complaint, as he could no longer apply for internal positions and gather further evidence of the discrimination

he had experienced.'" Doc. 61 at 76. Canton's testimony, according to plaintiff, constitutes direct evidence of retaliation.

The court disagrees. Plaintiff's interpretation of Canton's testimony is unsupported by the record. Canton testified that she "felt as though [plaintiff's] concerns were resolved . . . ." Doc. 61-4 at 9–10. No reasonable factfinder plausibly could infer from this testimony that Canton meant defendant had "resolved" the problem of plaintiff complaining by placing him on a final warning and preventing him from securing a promotion. And, even if plaintiff's interpretation of Canton's testimony had merit, it still wouldn't qualify as direct evidence. "'Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'" *Riggs*, 497 F.3d at 1117 (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007)). The interpretation that plaintiff urges requires an inference that Canton meant "resolved" in the sense that defendant prevented plaintiff from applying for other positions within its company. That argument isn't direct evidence. The court thus concludes that plaintiff has presented no direct evidence of retaliation.

### b. Circumstantial Evidence

"Absent direct evidence of retaliation, retaliation claims are analyzed under the *McDonnell Douglas* framework." *Boese v. Fort Hays State Univ.*, 814 F. Supp. 2d 1138, 1145 (D. Kan. 2011). To make a prima facie case of retaliation, plaintiff must show (1) he engaged in protected activity, (2) defendant took an adverse employment action against him, and (3) a causal connection exists between the protected activity and the adverse action. *Id.* (citing *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008) (further citation omitted)). If the plaintiff can establish a prima facie case, the burden shifts to the defendant to produce evidence

of a non-discriminatory reason for the actions comprising the alleged retaliation. *Id.* If defendant satisfies its burden, the burden then shifts to the plaintiff to establish pretext. *Id.*

### i. Prima Facie Case

Plaintiff asserts he has made a prima facie case of retaliation. Plaintiff emailed Canton complaining about discrimination on April 25, 2018. He met with her about his complaint on April 26, 2018. Filing a discrimination complaint is protected activity under Title VII. *Lounds*, 812 F.3d at 1234. Plaintiff received a final warning on May 17, 2018. The final warning caused plaintiff to forfeit the tuition benefit defendant provided and prevented him from applying for other positions within the company. Doc. 61 at 76–77. This final warning constitutes an adverse employment action. *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) (holding that a "materially adverse employment action" requires evidence that employee's employment status was affected). Plaintiff thus has satisfied the first two parts of his prima facie case.

The final element of the prima facie case requires a causal connection between plaintiff's discrimination complaint and the final warning. Defendant concedes that the temporal proximity of these events satisfies plaintiff's burden. Doc. 54 at 35. "A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996)); *see also Meiners v. Univ. of Kan.*, 239 F. Supp. 2d 1175, 1195 (D. Kan. 2002) (holding that timing of protected activity and adverse employment action "can provide sufficient support for plaintiff's prima facie case . . ."). The Tenth Circuit has "held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation." *Anderson*, 181 F.3d at 1179 (citation omitted). Defendant issued plaintiff a final warning about

three weeks after his discrimination complaint.  Plaintiff thus has established a prima facie case of discrimination based on the timing of his discrimination complaint and the final warning.

### ii.  Legitimate, Non-Discriminatory Reason

Next, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for issuing plaintiff a final warning.  Defendant asserts that it issued plaintiff a final warning for the reasons explained in Shelton's memorandum, which included plaintiff's lack of professionalism, lack of improvement in response to feedback from his supervisors, and insubordination.  *See* Doc. 54-21 at 1.  Plaintiff concedes that defendant has met its burden to articulate a legitimate, nondiscriminatory reason for its actions.

### iii.  Pretext

The burden thus shifts back to plaintiff, requiring him to show a genuine issue for trial whether defendant's articulated reason was pretext for retaliation.  *Lounds*, 812 F.3d at 1234.  "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision."  *DePaula*, 859 F.3d at 970. (citations and internal quotation marks omitted).  A plaintiff can satisfy this burden by "'revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.'"  *Id.* (citation omitted).

Plaintiff asserts he has adduced sufficient evidence to create a genuine issue of material fact about defendant's reasons for issuing plaintiff a final warning.  Doc. 61 at 77.  First, plaintiff reiterates the fact that defendant issued plaintiff a final warning three weeks after he filed his discrimination complaint.[18]  *Id.* at 78.  Defendant counters that timing alone is insufficient to

---

[18]     Plaintiff asserts that, in addition to the final warning issued three weeks after plaintiff's complaint, the timing of Shelton's May 10, 2018 email to Reeves "setting up the final written warning"

establish pretext. Doc. 54 at 35–36. On this point, the court agrees with defendant. The timing of an adverse employment action may be evidence of pretext, but "it is not sufficient standing alone to *establish* pretext." *Bird v. W. Valley City*, 832 F.3d 1188, 1204 (10th Cir. 2016) (citing *Plotke v. West*, 405 F.3d 1092, 1105 (10th Cir. 2005)); *see also Meiners*, 239 F. Supp. 2d at 1195 ("Timing alone can provide sufficient support for plaintiff's prima facie case, but it is not alone sufficient to make a showing of pretext."); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1260 (10th Cir. 2001) (one month between complaint and termination "indicates at most that [plaintiff] has established a prima facie case."). So here, the timing of plaintiff's complaint and the final warning, standing alone, are insufficient to establish pretext.

Plaintiff contends that he has presented more evidence of pretext than just suspicious timing. First, plaintiff directs the court to Canton's May 1, 2018 email about a "recent 'coaching' experience" with Shelton and plaintiff, where she and Shelton saw "quick results in terms of the employee acceptance and ownership." Doc. 61-26 at 1. Plaintiff asserts that the substance of Canton's email is inconsistent with defendant's assertion that plaintiff continually had issues with accepting and applying feedback. Doc. 61 at 78 (citing Doc. 54 at 35). Defendant counters that the May 17, 2018 incident, *i.e.*, plaintiff's behavior during the meeting with Shelton about why Shelton had accepted the document the agent had provided, triggered the final warning. The fact that Canton sent a positive email about plaintiff three weeks before the final warning is immaterial. The court agrees with defendant here. An email from a Human

---

also is evidence of pretext. Doc. 61 at 78. Shelton wrote in this email that he had "coached [plaintiff] as much as [he could], so now [he is] in an observation period to see if [plaintiff] responds to the coaching or keeps with his ways . . . ." Doc. 54-19 at 1. But plaintiff provides no evidence to support the assumption that this email "set[] up" the final warning, or that its timing is suspicious. Shelton had recorded his previous "coaching" of plaintiff in the Interaction Log, and his email to Reeves is consistent with this record. The court finds no evidence of pretext based on the timing of this email and the final warning.

Resources manager praising plaintiff for accepting feedback on one occasion can't establish pretext. Shelton documented in the Interaction Log his repeated "coaching" of plaintiff. He documented that plaintiff had walked out during a meeting with him on May 17, 2018, the day before he issued the final warning. And the final warning lists a host of reasons plaintiff had failed to meet defendant's employment expectations. Canton's positive email about plaintiff accepting feedback—three weeks before the final warning—reveals no material inconsistency in defendant's explanation for issuing plaintiff a final warning.

Second, plaintiff directs the court to the part of the final warning asserting that plaintiff's "behavior [] creates a negative work environment with [his] peers." Doc. 61 at 78 (citing Doc. 54-21 at 1). Plaintiff asserts this statement is pretextual because none of plaintiff's coworkers had complained about his behavior. *Id.* Defendant again asserts that whether plaintiff's coworkers complained about his behavior is immaterial. Doc. 69 at 76. Again, the court agrees. Plaintiff's supervisors concluded that he was creating a negative work environment for his peers. They don't need to support that conclusion with complaints from plaintiff's coworkers. *See DePaula*, 859 F.3d at 971 ("Instead of asking whether the employer's reasons 'were wise, fair, or correct,' the relevant inquiry is whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'" (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007)). No reasonable trier of fact could find any inconsistency or bad faith here. Plaintiff has failed to present evidence of pretext based on the substance of the final written warning.

Next, plaintiff asserts that defendant's "failure to follow its progressive discipline process" is evidence of pretext. Doc. 61 at 78. Plaintiff contends that Shelton knew he could have used a lesser form of discipline but never considered doing so. *Id.* And Shelton knew that

supervisors rarely issue a final written warning without a lesser form of discipline first. *Id.*
Defendant counters, asserting that Shelton decided that the incident warranted a final warning.
Doc. 69 at 73. Even if moving directly to a final warning qualified as a rare occurrence,
defendant contends, Shelton violated no company policy by doing so. *Cf., Metzger v. City of
Leawood*, 144 F. Supp. 2d 1225, 1262 (D. Kan. 2001) ("A defendant's failure to follow its own
written policy can be evidence of pretext."). That Shelton knew he had lesser means of
discipline available to him (and, indeed, that defendant's supervisors typically used lesser means
of discipline before issuing a final warning)—without more—creates no triable issue whether the
final warning was pretext.

Finally, plaintiff asserts that the evidence suggests Shelton behaved in "bad faith, or at
least in an inconsistent and incoherent manner." Doc. 61 at 79. On May 10, 2018, Shelton sent
plaintiff a message about his phone metrics,[19] saying "[t]his is fantastic, nice work sir." Doc. 61-
18 at 1. He added, "great job! You're really supporting our team more than you know with
phone metrics." *Id.* One hour later, Shelton sent his supervisor an email saying that he had
"coached [plaintiff] as much as [he could]." Doc. 54-19 at 1. Plaintiff argues that Shelton's
"wild shift from high praise to total dismissal" raises questions about Shelton's motives and
creates a genuine issue of material fact about why plaintiff received a final warning. Doc. 61 at
79. The court disagrees. There is no inconsistency in Shelton praising plaintiff for his
performance, while telling his supervisor that he had coached plaintiff as much as he possibly
could. And there is nothing inconsistent about Shelton praising plaintiff about his performance
one week, and then issuing plaintiff a final warning the next week because of an unrelated,
intervening event. The court finds no triable issue here.

---

[19]     The record never defines "phone metrics," but in context it appears to measure an employee's
productivity or performance.

In sum, plaintiff's evidence cannot support a triable issue whether defendant's reasons for issuing plaintiff the final written warning were pretext. The timing of the defendant's discrimination complaint and the final written warning—without more—does not establish pretext. *See Bird*, 832 F.3d at 1204–05 (holding that timing of plaintiff's termination "is *relevant* to her attempt to show that [defendant's] reasons for firing her were pretextual, but it is not *sufficient* to establish that pretext.") Other than the timing of the final warning, plaintiff has presented no evidence of pretext. The court thus grants summary judgment against plaintiff's retaliation claim based on the final written warning. *See id.* at 1205 (affirming summary judgment, because other than the timing of her termination, plaintiff made no arguments sufficient to convince the court that a rational factfinder could find defendant's reasons for terminating her employment unworthy of belief).

### 2. Termination

This analysis leaves plaintiff's claim that defendant unlawfully retaliated against him by terminating his employment on October 25, 2018.[20] Since plaintiff never asserts he has direct evidence that this employment decision was retaliation, the court considers his claim under the *McDonnell Douglas* framework.

---

[20] Plaintiff argues that if his retaliation claim based on the final written warning survives summary judgment, so too should his retaliation claim based on his termination. Doc. 61 at 87. Plaintiff relies on the "cat's paw" theory to support this argument. *Id.* "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006) (citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998)). Plaintiff never explains how this theory might apply to this case and the court understands why he didn't: the court fails to see how this doctrine could apply, given this set of summary judgment facts. And, in any event, since the court grants summary judgment against plaintiff's retaliation claim based on the final warning, the court declines to consider the merits of plaintiff's cat's paw argument.

### a. Prima Facie Case

To make a prima facie case of retaliation, plaintiff must show (1) he engaged in protected activity, (2) defendant took an adverse employment action against him, and (3) a causal connection exists between the protected activity and the adverse action. *Boese*, 814 F. Supp. 2d 1138, 1145 (citing *Fischer*, 525 F.3d at 979 (further citation omitted)). Plaintiff has met his burden on the first two elements of the prima facie case. Plaintiff filed an internal complaint of discrimination on April 26, 2018, and an EEOC Charge on May 21, 2018. He filed this lawsuit on October 19, 2018. Plaintiff sustained an adverse employment action when defendant terminated his employment on October 25, 2018. *See Hillig*, 381 F.3d at 1032–33 (holding that adverse employment action includes acts that cause a significant change in employment status, such as a firing).

But the parties dispute whether plaintiff has established the third element of his prima facie case, *i.e.*, a causal connection between his protected activity and his termination. Defendant asserts that plaintiff's termination occurred some five months after he filed his discrimination complaint with the EEOC. Doc. 54 at 36. A five-month period between the protected activity and termination cannot support an inference of causation. *See, e.g.*, *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir. 2019) (holding that where a gap of three months or longer has occurred, a plaintiff must present other evidence of causation). But, plaintiff responds, he filed this lawsuit six days before his termination. This time interval, plaintiff asserts, raises an inference of causation. Doc. 61 at 81. "A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson*, 181 F.3d at 1179 (citing *Chavez*, 88 F.3d at 866). As one would expect, the cases conclude that a six-day period between protected activity and adverse action can establish causation. *See Meiners*, 359 F.3d at 1231 (holding that a six-

week period between protected activity and adverse action may be sufficient, standing alone, to show causation).

But, defendant counters. It asserts that the undisputed facts show that Sims did not know about this lawsuit when he terminated plaintiff. And to prevail on a retaliation claim, the decisionmaker must have knowledge of the protected activity. *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1213 (10th Cir. 2018) ("For how can decisionmakers retaliate against an employee if they do not know about the protected activity?"); *see also Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1266 (10th Cir. 1998) (holding that a plaintiff must show he "was intentionally retaliated against by [his] employer."). Defendant asserts that plaintiff has presented no evidence controverting Sims's testimony that he didn't know about plaintiff's protected activity before his termination. Doc. 54 at 38.

Plaintiff responds, asserting that despite Sims's testimony, there is "reason to believe" Sims knew about the lawsuit. Doc. 61 at 82. Plaintiff mailed the waiver of service on October 19, 2018. Plaintiff asserts that a jury reasonably could infer that defendant received notice of the lawsuit between October 22, 2018 and October 25, 2018. And, plaintiff contends, it is likely that Canton, as Human Resources manager, would have received the lawsuit.[21] Plaintiff's affidavit testified that he saw Canton walk over to Sims desk on October 24 or 25, shortly before plaintiff's termination on October 25. Plaintiff contends that Canton "went to tell Sims about [the lawsuit] in person, or went in person to instruct him to terminate plaintiff." Doc. 61 at 83.

---

[21] When defendant receives notice of lawsuits by mail, Support Service employees give it to one of three Human Resources employees, including Canton. Canton is the only person in Human Resources who oversees the Olathe Service Center. Plaintiff asserts that "given Canton's involvement in the matters underlying the lawsuit," and the fact that plaintiff's Right to Sue Letter had been addressed to her, it is likely that she received notice of the lawsuit. Doc. 61 at 83. Canton, however, testified that she did not know about the lawsuit before plaintiff's termination.

The court assumes, without deciding, that plaintiff has made his prima facie case. Even if plaintiff could make out a prima facie case of discrimination on this summary judgment record, the court concludes below that his claim cannot survive summary judgment because the undisputed facts fail to present a triable issue whether defendant's termination of plaintiff's employment was pretextual.

### b. Legitimate, Nondiscriminatory Reason and Pretext

Defendant asserts that its legitimate, non-discriminatory reason for plaintiff's termination was the way he handled the October 22, 2018 call with the agent, and his ongoing issues with accepting feedback.[22] Doc. 54 at 38. Plaintiff argues that defendant's reasons for terminating him are pretextual, and he directs the court to various inconsistencies in defendant's reasoning for his termination. First, plaintiff asserts that in the October 24 meeting, Sims faulted plaintiff for failing to notify him of the call from the agent, even though the agent never asked that Sims call her. And second, plaintiff asserts, Sims criticized plaintiff for *following* defendant's policy about backdating discounts. Doc. 61 at 85. Third, Sims told plaintiff in the meeting that he should apply the feedback Sims and Mazzetta had provided him, which plaintiff interprets to mean that "Sims [had] reached the conclusion that [p]laintiff should not be terminated" just one

---

[22] Sims's Termination Recommendation states:

> [Plaintiff] was placed on a final warning on May 17, 2018 for policy violation regarding his emotional resilience, accepting/applying feedback and his professionalism and conduct with agents as well as his direct supervisor. While reviewing a call that [plaintiff] received from an agent on October 22, 2018, he showed no resilience during the coaching session as to what could have been improved or changed during the interaction. From his viewpoint, it was a typical call with our customers. When the agent asked for a supervisor, he did not seek guidance and did not provide this information to leadership concerning the interaction nor the request for a supervisor.

Doc. 54-25 at 1.

day before he recommended terminating plaintiff.  Plaintiff argues that these "inconsistencies" establish a triable issue of pretext.

The court disagrees.  Plaintiff's arguments fail to demonstrate a triable issue whether defendant's reasons for terminating plaintiff were pretextual.  The Termination Recommendation Memo states, in part, that plaintiff had failed to inform his supervisor about the October 22 call where the agent requested to speak with a supervisor.[23]  *See* Doc. 54-25 at 1.  Plaintiff focuses solely on the fact that the agent did not explicitly ask for a supervisor during the call.  Plaintiff contends that this establishes an inconsistency in defendant's reasoning and creates a genuine issue of material fact about defendant's reasons for terminating plaintiff.  But no reasonable trier of fact plausibly could infer pretext based on Sims's criticism of plaintiff for failing to inform him of the call.  The agent told plaintiff she wanted to speak to his supervisor.  But plaintiff never informed Sims of the call.  Plaintiff may have believed he had no reason to inform Sims of the call, but the court considers the situation from the employer's perspective, not plaintiff's.  "'In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*,' and 'do not look to the plaintiff's subjective evaluation of the situation.'"  *DePaula*, 859 F.3d at 971 (quoting *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011)).  "Evidence that the employer 'should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility.'"  *Id.* at 970–71 (quoting *Swackhammer*, 493 F.3d at 1169–70).  Sims's criticism of

---

[23]  During the call, plaintiff asked the agent to identify the person who was the subject of the agent's request when the agent asked if she could talk to someone else about the discount at issue.  The agent responded, "maybe your supervisor."  Plaintiff informed the agent that he believed his supervisor was in a meeting.  The agent asked for voicemail, and plaintiff told her he did not believe his supervisor had set up his voicemail.  The agent later said that she would call back when she had the documentation and speak with someone else.

plaintiff's failure to notify him of the agent's call—even if plaintiff is correct that he had no obligation to inform Sims about the call—is insufficient to support a finding of pretext.

Next, plaintiff's contention that Sims "criticized" plaintiff for following defendant's backdating guidelines never "'reveal[s] weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.'" *DePaula*, 859 F.3d at 970 (quoting *Tabor*, 703 F.3d at 1216). Sims acknowledged that plaintiff had followed the guidelines, and defendant never asserted that it terminated plaintiff because he did or didn't follow the backdating guidelines. Defendant's expressed reason for terminating plaintiff was for "showing no resilience during the October 24 coaching session and failing to inform his supervisor about the October 22 call and the request for a supervisor, in combination with his ongoing performance issues . . . ." Doc. 79 at 82. Plaintiff's adherence to the backdating guidelines is not material to the analysis.

Also, plaintiff's conclusion that Sims had "decided" at the end of the October 24 meeting that plaintiff should not be terminated is unsupported by any admissible evidence. Sims's statement that plaintiff should apply his feedback in the future suggests no imminent termination. But, given that plaintiff's termination was based, in part, on his behavior in the October 24 meeting, Sims's comment is insufficient to support a finding of pretext. *See* Doc. 54-25 at 1 ("While reviewing a call that [plaintiff] received from an agent on October 22, 2018, he showed no resilience during the coaching session . . . .")

Finally, plaintiff asserts his purported "inability to accept feedback" is a pretextual reason for his termination. Doc. 61 at 86. Plaintiff asserts that Sims's termination recommendation stated that plaintiff "showed no resilience during the [October 24, 2018] coaching session as to

what could have been improved or changed during the interaction." *Id.* (citing Doc. 54-25 at 1).

Plaintiff contends that this part of Sims's recommendation "does not clearly state that other instances of failure to take feedback were part of the reason for termination." Doc. 61 at 86. And, plaintiff asserts, the recording of the October 24, 2018 meeting shows that plaintiff "was, in fact, receptive to feedback." *Id.* That Sims's memo never explicitly states that plaintiff was unable to accept feedback reveals no inconsistency in defendant's reasoning. Sims's Recommendation referenced both plaintiff's inability to accept feedback in the October 24 meeting, and his earlier final warning based on his issues "accepting/applying feedback." Doc. 54-25 at 1. No reasonable factfinder could find any inconsistency or contradiction that would render the defendant's proffered reason "unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Swackhammer*, 493 F.3d at 1167 (citation and internal quotation marks omitted). And, as explained above, even if plaintiff believed he was receptive to feedback in the October 24 meeting, the court "'do[es] not look to the plaintiff's subjective evaluation of the situation.'" *DePaula*, 859 F.3d at 971 (quoting *C.R. England*, 644 F.3d at 1044).

Plaintiff has not carried his burden at the pretext level of the analysis. He has not adduced admissible evidence of a plausible basis for a finding "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in defendant's reasons for terminating plaintiff's employment. *DePaula*, 859 F.3d at 970 (citation and internal quotation marks omitted). The court thus grants summary judgment against plaintiff's retaliation claim based on his termination.

**IV.     Conclusion**

For all these reasons, the court concludes that the summary judgment facts, when viewed in plaintiff's favor, present no triable issue whether defendant's decision not to hire plaintiff for an AU position, and later to issue him a final warning and ultimately terminate him, was pretext for discrimination and retaliation.  The court grants defendant's motion and enters summary judgment against plaintiff's claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 53) is granted.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court shall enter a judgment in defendant's favor on all of plaintiff's claims.

**IT IS SO ORDERED.**

**Dated this 26th day of March, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**